UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

FREDERICK ARLEN RENFRO,    )
    )
    Plaintiff,    )
    )    No. 2:12-cv-8
v.    )
    )    *Mattice / Lee*
COMMISSIONER OF SOCIAL SECURITY,    )
    )
    Defendant.    )

## REPORT AND RECOMMENDATION

Plaintiff Frederick Renfro brought this action pursuant to 42 U.S.C. §§ 405(g) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying him disability insurance benefits ("DIB"). Plaintiff has moved for judgment on the pleadings [Doc. 9] and Defendant has moved for summary judgment [Doc. 11]. Plaintiff alleges the Administrative Law Judge ("ALJ") did not adequately evaluate the opinion of his treating physician and failed to properly consider his mental and physical impairments in concluding there was work Plaintiff could perform. For the reasons stated below, I **RECOMMEND** that (1) Plaintiff's motion for judgment on the pleadings [Doc. 9] be **GRANTED IN PART** to the extent it seeks remand to the Commissioner and **DENIED IN PART** to the extent it seeks an award of benefits; (2) the Commissioner's motion for summary judgment [Doc. 11] be **DENIED**; and (3) the Commissioner's decision denying benefits be **REVERSED** and **REMANDED** pursuant to Sentence Four of 42 U.S.C. § 405(g).

## I. ADMINISTRATIVE PROCEEDINGS

Plaintiff initially filed his application for DIB on December 11, 2008, alleging disability as of January 31, 2008 (Transcript ("Tr.") 124-28). Plaintiff's claim was denied initially and upon

reconsideration and he requested a hearing before an ALJ (Tr. 59-70). The ALJ held a hearing on

July 28, 2010, during which Plaintiff was represented by an attorney (Tr. 27-48, 97). The ALJ

issued his decision on August 17, 2010 and determined Plaintiff was not disabled because there were

jobs in significant numbers in the economy which he could perform (Tr. 6-22). The Appeals

Council denied Plaintiff's request for review, making the ALJ's decision the final, appealable

decision of the Commissioner (Tr. 1-5). Plaintiff filed the instant action on January 12, 2012 [Doc.

1].

## II.    FACTUAL BACKGROUND

### A.    Hearing Testimony

During the hearing, Plaintiff's onset date was amended by agreement to March 1, 2008, as

he had worked through February 2008 (Tr. 30-31). Plaintiff was 39 at the time of the hearing, had

a college degree and had spent two years training at the Texas Heart Institute after receiving his

degree (Tr. 32). Plaintiff had worked as a profusionist (or perfusionist), which involved running a

heart-lung machine during a heart bypass or other heart surgery (Tr. 32). Plaintiff stopped working

because he was suddenly hit with a deep depression; he stated he did not miss work because of his

depression, but it was noticed at work, and he could not continue working because of it (Tr. 35).

After he stopped working, Plaintiff had moved back to Tennessee and was living by himself, but

after only about a month, he had to move in with his parents because he was not eating, taking

showers, or engaging in other activities (Tr. 35-36). Plaintiff had been receiving treatment from a

counselor and psychiatrist when he was able to afford it and had improved to the point where he

took showers every day and sometimes read the newspaper a little (Tr. 36-37). Plaintiff testified he

was currently unable to afford counseling (Tr. 37). He still saw a psychiatrist about once every three

2

months and was taking Cymbalta, Wellbutrin, Depakote, and Neurontin (Tr. 37).

Plaintiff stated the medicine was helping him, but he still had poor sleep habits and was very fatigued all day (Tr. 37, 39). Plaintiff testified he had previously been very active and social but now mainly watched TV, did not help with any household chores, and did not have any social life (Tr. 39-40). Plaintiff had good and bad days with concentration and had difficulties dealing with stress (Tr. 40). Plaintiff could not explain why this had happened to him and testified he had lost everything and had never been a person who liked to sit back and take it easy; although one of his doctors encouraged him to help his parents on the farm, he had not been able to bring hims\elf to help (Tr. 40-42).

Plaintiff testified that his psychological evaluation with Dr. Roth did not go well because he was so depressed at the time, he did not want to be there and did not make a good effort (Tr. 37-38, 40). Plaintiff stated the same was true with his evaluation with Elizabeth Jones (Tr. 42).

**B.     Vocational Expert Testimony**

The ALJ solicited testimony from vocational expert Bentley Hankins ("VE") during the hearing. The ALJ asked the VE to assume an individual of Plaintiff's age, educational level, and work experience who had no exertional limitations but was limited to simple, routine, repetitive work (Tr. 44). The VE testified such an individual could work as a material mover or handler, janitor or building cleaner, stock clerk and order filler, food preparation worker, or production worker, with nine to 10 million jobs nationally and 250,000 to 275,000 in Tennessee (Tr. 44). The ALJ next asked the VE to assume an individual of the same age, educational level, and work experience, but who had all the limitations described by Plaintiff in his testimony; the VE did not believe any jobs would be available for such a person (Tr. 44-45).

Plaintiff's attorney asked the VE if there would be jobs available for an individual who was limited as outlined by Dr. Robbins; the VE testified this individual could not perform any jobs because he could not engage in meaningful work-related behavior or deal with social situations or stress (Tr. 45-46). The VE agreed this assessment was consistent with Plaintiff's testimony (Tr. 46). The VE further testified an individual with a Global Assessment of Functioning ("GAF") score of 52 on an ongoing basis would be unemployable (Tr. 46-47).

### C. Medical Records[1]

#### 1. Physical Records

Plaintiff had procedures related to diagnosing and removing kidney stones as far back as 1999 and continuing for several years; he had various scans and x-rays related to the kidney stones and reported to Indian Path Medical Center ("IPMC") for treatment or removal of the stones in 2002, 2004, 2005, 2006, and 2007 (Tr. 271-78, 289-307, 310, 432, 438-39, 441-48, 472-75, 478-79). Plaintiff was also diagnosed with parathyroid disease in 2000 and had a parathyroidectomy that apparently resolved the problem (Tr. 424-26, 459-70, 476-77). Plaintiff began following with Dr. Jason Brazee at some point in the early 2000s and complained of chest and back pain and a possible kidney contusion in February, March and April 2002 (Tr. 401-11). Scans of Plaintiff's thoracic and cervical spine on March 19, 2002 showed minimal levoscoliosis and kidney stones (Tr. 436-37). Plaintiff saw a neurologist on March 29, 2002 and had an MRI done after a fall that caused weakness

---

[1] There is a dispute about whether Plaintiff has raised an argument about the ALJ's determination as to his physical impairments. Although Plaintiff did not flesh out this argument specifically, it appears to be a general challenge to the ALJ's RFC determination and, as such, both Plaintiff's mental and physical impairments will be summarized. In addition, some of the information contained in Plaintiff's physical records has bearing on the ALJ's treatment of Plaintiff's mental health records.

4

on his right side and neck; the notes document previous head trauma from football and a motorbike wreck and visual disturbances (Tr. 434, 455-58). Plaintiff had a positive tuberculosis test in July 2003 and received treatment (Tr. 399-400, 449-53).

Plaintiff saw his urologist, Dr. Woodrow Reeves, on January 28, 2008 complaining of flank pain, and a scan of Plaintiff's kidneys showed two left renal calcifications (Tr. 270, 312, 331). On February 27, 2008, Plaintiff was admitted to IPMC for kidney stone removal and on March 3, 2008 Plaintiff had remaining fragments removed (Tr. 227-69, 318-30). Plaintiff's stent was removed by Dr. Reeves on March 6, 2008 (Tr. 312). Plaintiff called Dr. Reeves' office on April 3, 2008 and stated he was having pain; he was told he needed to have a CT scan done before they would prescribe any pain medication, and Plaintiff refused the scan (Tr. 312). Plaintiff returned to IPMC on May 31, 2008 and was again diagnosed with kidney stones; a CT scan showed nonobstructing small nephrolithiasis and multiple small calcifications in the pelvis (Tr. 186-204). On June 6, 2008, Plaintiff called Dr. Reeves and complained of two stones causing him pain, particularly after playing soccer (Tr. 311).

After receiving medication from Dr. Brazee for an upcoming trip to Canada on July 1, 2008, Plaintiff was refused Dilaudid without an x-ray on July 30, 2008, after he had returned (Tr. 386-89). Plaintiff presented with right flank pain on January 10, 2009 and was diagnosed with a kidney stone; he declined its removal (Tr. 365-83). On March 11, 2009, Dr. Reeta Misra completed a medical consultant analysis form and opined Plaintiff did not have severe physical impairments because, although the records reflected hyperparathyroidism and kidney stones, the conditions were managed (Tr. 494-97). Dr. Misra opined the conditions would cause pain when exacerbations occurred, but were overall non-severe and would not reduce Plaintiff's residual functional capacity ("RFC") (Tr.

5

497). Dr. Misra's assessment was affirmed on October 8, 2009 (Tr. 524).

Plaintiff saw Dr. Scott Macdonald on April 28, 2010 by referral of Dr. Robbins (Tr. 527-28). Plaintiff reported daily sharp and sometimes throbbing headaches, and Dr. Macdonald noted a slight indentation in his left skull which Plaintiff attributed to his motorcycle accident at age 16 (Tr. 527-28). Dr. Macdonald referred Plaintiff for an electroencephalogram ("EEG") and an MRI; the EEG on April 30, 2010 was normal (Tr. 531). An MRI of Plaintiff's brain on May 14, 2010 was normal (Tr. 529-30). Plaintiff returned to Dr. Macdonald on May 18, 2010 for review of his tests and reported continued daily headaches (Tr. 526). During his visit to Dr. Brazee on June 24, 2010, Plaintiff reported fatigue, depression, frequent headaches and stated he had been bedridden for the last three months; his blood pressure was high (Tr. 561-62).

### 2. Mental Records

During an appointment with Dr. Brazee about his positive TB test, Plaintiff also recounted panic attacks following a boating accident (Tr. 399-400, 449-53). Dr. Brazee referred Plaintiff to Dr. Kutty (Tr. 393). By letter of February 15, 2004, Dr. Brazee wrote that following the May 2003 boating accident, Plaintiff was having anxiety and panic attacks, nervousness, insomnia, loss of appetite, loss of interest in his usual activities, and was unable to concentrate at work (Tr. 392).

Plaintiff followed with Dr. Smith of Psychiatric Associates of Kingsport for his mental health needs starting in April 2008 (Tr. 334-64). Initially, Plaintiff was depressed due to unemployment, was having legal problems with a DUI that was making it hard to find new employment, and was having friction with his father about the DUI and money (Tr. 353-54, 359-60). Plaintiff stated he had previously sought treatment from Dr. Kutty, who said he might be bipolar (Tr. 358). Plaintiff described having periods of not needing sleep, racing thoughts, impulsive purchases and stated he

6

had abused narcotics for his kidney stones and had blacked out from alcohol during the time he worked at his last job (Tr. 358). Plaintiff reported he had not used alcohol in eight months (Tr. 358). Plaintiff was diagnosed with bipolar disorder, depressed; alcohol abuse; and narcotic abuse (Tr. 356). In late April 2008, Plaintiff had officially received his first offense DUI and was anxious and worried with low motivation and interest; he was not able to have fun, struggled to get out and mow the yard, and had episodes of vomiting (Tr. 351-52). On May 19, 2008, Plaintiff reported the depression lifted but he would then become disillusioned by his situation; he was still tired and fatigued, did not appreciate fun, and could not handle housekeeping (Tr. 349-50).

In June 2008, Plaintiff's father called to express concerns about his son's substance abuse and stated Plaintiff was staying out late and lying to him (Tr. 348). Plaintiff was in denial about alcohol and was going to multiple places to get pain medications (Tr. 347). During a session in July, Plaintiff was still awaiting a decision on employment, admitted he had used alcohol in the past month but had removed it all from the house, and stated the depression seemed to lift; he was not attending Alcoholics Anonymous meetings and reported his girlfriend broke up with him for being too negative (Tr. 345-46). Plaintiff admitted abusing narcotics in August 2008 by injecting his kidney stone pain medicine because he was not responding to the medication as well (Tr. 342). In October 2008, Plaintiff reported sleeping 17 hours a day and stated he was no longer taking pain medicine for kidney stones; he was not as depressed but was still unmotivated to do anything (Tr. 340-41). Plaintiff called a few days later to request a doctor's excuse for missing class due to mental health problems (Tr. 339). On December 16, 2008, it was noted Plaintiff had missed appointments and now complained of low motivation and fatigue; he was taking classes and getting along better with his father and wanted to go back to school to finish an environmental science degree (Tr. 363-

64). Plaintiff reported that he did not get out of the house and had trouble focusing and completing tasks (Tr. 363). Plaintiff's medication was changed several times throughout 2008 (Tr. 334-35).

Plaintiff began following with Dr. Margaret Robbins on January 22, 2009 and reported a dramatic change in his lifestyle following what he described as brain damage after a series of medical problems the previous year, starting with stress from work causing him to use alcohol to calm himself, a slow recovery from surgery in February 2008, and abusing pain medication due to pain in August 2008 (Tr. 480-84). Plaintiff reported a diagnosis of bipolar disorder four years prior and more recent problems getting out of bed, increased irritability that was interfering with his social relationships, decreased social life because his friends described him as sad and aimless, inability to focus, and severe panic (Tr. 480-81). Plaintiff admitted injecting Dilaudid after his February 2008 surgery, which led to abuse, and that he drank significant amounts of alcohol in the year before he quit his job because of severe anxiety caused by a tough supervisor (Tr. 482). Plaintiff reported he discontinued alcohol use in August 2008 and stated he had had no problems with other drugs (Tr. 482). Plaintiff told Dr. Robbins it would be impossible to return to work unless he could be more active in his daily activities (Tr. 482). Plaintiff reported living with his parents, who monitored him for substance abuse (Tr. 483). Dr. Robbins diagnosed Plaintiff with panic disorder with agoraphobia, bipolar disorder, most recent episode depressed recurrent without psychosis, and alcohol abuse (Tr. 483-84). Dr. Robbins referred Plaintiff to Dr. Eric Roth for a neuropsychological assessment (Tr. 484).

On February 13, 2009 Plaintiff submitted to a psychological examination with Elizabeth A. Jones, M.A. (Tr. 485-89). Plaintiff reported a theory that going under anesthesia so many times had caused his current problems and stated he used to hunt, fish, water ski, and play soccer, but now he

just watched TV (Tr. 486). Plaintiff's attention and concentration were somewhat poor and psychomotor retardation was noted (Tr. 487). Ms. Jones noted Plaintiff's premorbid level of functioning was likely higher than currently indicated, at the above average range; his current mental status appeared to be in the low average range (Tr. 487). On bad days, Plaintiff reported laying on the couch all day; on good days, he would run errands or go to his parents' house; there were more bad days than good (Tr. 488). Plaintiff reported a decline in social activity and a preference for being by himself (Tr. 488). Ms. Jones diagnosed Plaintiff with major depressive disorder, severe without psychotic features, assigned him a GAF of 45-50,[2] and opined Plaintiff was moderately limited in his ability to understand and remember and may have difficulty doing so for complex instructions; he was also moderately limited in his ability to sustain concentration and persistence and remembering and carrying out instructions (Tr. 489). Ms. Jones further opined Plaintiff appeared to be moderately limited in his ability to interact appropriately with the general public due to avoidant tendencies, would be moderately limited in his ability to adapt, and would likely have significant difficulties setting realistic goals and making plans independent of others (Tr. 489).

Plaintiff returned to Dr. Robbins on February 19, 2009 and reported that he may have had a couple beers since the prior appointment but his father was monitoring him closely; they discussed keeping a chart about events that happened to track his sleep patterns and medication changes (Tr. 547-48). Dr. Robbins observed Plaintiff had little interest in initiating and maintaining activities at this time and noted he was very interested in getting better (Tr. 547). On March 26, 2009 Plaintiff

---

[2] A GAF score between 31 and 40 indicates "some impairment in reality testing or communication" or a "major impairment in several areas," a GAF score between 41 and 50 corresponds to a "serious" psychological impairment; a score between 51 and 60 corresponds to a "moderate" impairment; and a score between 61 and 70 corresponds to a "mild" impairment. *Nowlen v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 718, 726 (E.D. Mich. 2003).

9

arrived 20 minutes late for his appointment and reported an improvement in depression but an increase in TMJ and anxiety; he had given up alcohol completely and was still supervised closely by his father (Tr. 546). Plaintiff was living with his parents and working on the farm and had recently played basketball during what he described as a manic episode which resulted in a relatively normal sleep pattern and day (Tr. 546).

At the request of Dr. Robbins, Plaintiff submitted to a neuropsychological evaluation with Dr. Eric Roth on April 16, 2009 (Tr. 516-22). Dr. Roth noted Plaintiff's history of head trauma, including a motorcycle accident at age 16, various sports-related trauma, and a boating accident, and his difficult recovery after surgery in February 2008 (Tr. 516). Plaintiff also reported his diagnosis of bipolar disorder, his history of alcohol abuse and the end of his employment (Tr. 517). Plaintiff stated he had not had alcohol in the last four to six months (Tr. 517). When he returned for testing on May 5, 2009, Plaintiff was 45 minutes late (Tr. 518). Plaintiff appeared to have low energy and was irritable at times; he complained about the length and purpose of the testing and did not initiate interaction (Tr. 518). Dr. Roth observed Plaintiff appeared to have no functional cognitive problems but did seem inattentive at times and may have had problems with listening comprehension, although it was unclear whether it was a lack of effort or ability (Tr. 518). Dr. Roth had significant concerns about Plaintiff's level of effort during testing and his SIMS test score well exceeded the cut off for malingered symptomology and exaggeration in several scales (Tr. 518). Dr. Roth opined Plaintiff was severely exaggerating his current psychiatric picture, as he excessively endorsed psychiatric symptoms that are only rarely endorsed by individuals with severe mental illness (Tr. 518).

The WAIS-III test was administered and Plaintiff scored a full scale IQ in the low average

range, a verbal IQ of 91 and a performance IQ of 81; Dr. Roth noted the overall scores were likely depressed due to a low level of effort (Tr. 519). Plaintiff scored average on other tests, although he scored in the severely impaired range for recall of visually based information (Tr. 519). Dr. Roth noted scores on other tests were invalid or uninterpretable due to lack of effort or intentional exaggeration (Tr. 519). Dr. Roth diagnosed Plaintiff with cognitive disorder, mild, with some suggestion of right lateralized impairments, bipolar disorder, currently depressed phase, moderate to severe, malingering, and narcotics and alcohol abuse in remission, and assigned Plaintiff a GAF of 52 (Tr. 519). Dr. Roth concluded that although Plaintiff had some cognitive problems and bipolar disorder, his efforts to exaggerate symptoms was clear and it appeared he may be doing so to obtain financial support or to avoid work or social relationships (Tr. 520). Although the results were largely invalid, Dr. Roth opined Plaintiff could remain fully independent with basic activities of daily living (Tr. 520).

On April 21, 2009, Dr. Richard Gann completed Psychiatric Review Technique and Mental Residual Functional Capacity Assessment forms (Tr. 498-514). Dr. Gann noted Plaintiff's diagnoses of bipolar disorder, dysthymia, panic disorder, and alcohol abuse, and opined he would have moderate restrictions in maintaining social functioning and concentration, persistence, and pace (Tr. 498-508). Dr. Gann more specifically opined Plaintiff would have moderate limitations in his abilities to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual, complete a normal workday and workweek without psychological interruptions, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers without distracting them, and

11

respond appropriately to changes in the work setting (Tr. 512-13). Dr. Gann opined Plaintiff had had one or two episodes of decompensation and that he would also have mild restrictions in activities of daily living (Tr. 508). Dr. Gann noted that Plaintiff's treatment notes indicated significant depression with some psychomotor retardation, but that his subjective complaints were only partially credible because his reports of severe cognitive impairment were not supported by the evidence (Tr. 510). Dr. Gann noted that although Plaintiff could likely not return to his old job, he could complete simple, routine, repetitive, one and two step tasks on a sustained basis (Tr. 510, 514). Dr. Gann opined Plaintiff was able to maintain concentration, persistence and pace for two hour intervals, could maintain regular attendance and work a normal workweek, and could relate to coworkers and supervisors adequately on a sustained basis and accept instructions and respond appropriately to criticism (Tr. 514). Dr. Gann's assessment was affirmed on September 28, 2009 (Tr. 523).

Plaintiff returned to Dr. Robbins on May 21, 2009 with his parents, who believed Plaintiff did not need additional psychotherapy or counseling beyond Dr. Roth's care, and Dr. Robbins agreed (Tr. 544-45). Plaintiff's mother stated there were days he would not bathe and was withdrawn from many of his friends (Tr. 544). At his next session on June 25, 2009, Plaintiff reported seeing Ted Stevens for weekly therapy sessions and his parents reported more daily activity and help with chores on the farm (Tr. 543). Dr. Robbins observed Plaintiff seemed passive and almost confused at times and she expressed doubt about his ability to survive on his own given his dependence on his parents (Tr. 543). Plaintiff returned on October 27, 2009 and reported being unable to afford his home, so his parents had been renting it and he was living with them and watching TV all day (Tr. 542). Dr. Robbins urged Plaintiff to get out of the house each day and

Plaintiff reported feeling unmotivated, even after his mother's urging (Tr. 542). Plaintiff did not seem to be attending individual therapy (Tr. 542). During his session on December 10, 2009, Dr. Robbins noted that the etiology of Plaintiff's difficulty was not easy to trace but it seemed to be a combination of drinking, a high stress job, and medical illness, and Plaintiff could fully recover if he could regulate his mood and become more stable (Tr. 540-41). Plaintiff's father, a physician, had been decreasing Plaintiff's medication due to over-sedation and Plaintiff again reported isolation and feeling unable to focus and a lack of interest in engaging in activities, although his mother reported a recent episode of laughter while watching a movie (Tr. 540).

Plaintiff's parents returned on March 25, 2010 without Plaintiff, who would not leave the house to come to his appointment (Tr. 538-39). His parents reported they were monitoring him closely enough that substance abuse was not a problem, because Plaintiff spent his nights watching TV and slept all day; he only came out of his room to get food or drink (Tr. 538). No one was coming to the house that might assist Plaintiff in substance abuse (Tr. 538). Plaintiff's parents reported he was simply apathetic and unmotivated and Dr. Robbins opined Plaintiff may be developing a frontal lobe syndrome and recommended further testing (Tr. 538). Plaintiff's parents planned to make themselves in charge of his pills, although his parents described such extreme isolation it was unlikely Plaintiff would go looking for pills kept by his parents; Dr. Robbins again observed this could be due to frontal lobe problems and would not evince substance abuse (Tr. 539). On May 14, 2010, Dr. Robbins filled out an assessment of Plaintiff's ability to do work-related activities and opined he had fair abilities to follow work rules, use judgment, and maintain attention and concentration; poor abilities to relate to co-workers and interact with supervisors; and no abilities to deal with the public or deal with stressors (Tr. 535-37). Dr. Robbins explained Plaintiff

13

had trouble initiating and maintaining appropriate pace and persistence in accomplishing specific

tasks (Tr. 538). As for adjustments, Plaintiff had fair abilities to understand, remember, and carry

out complex or detailed job instructions and good abilities with simple instructions; this was

explained by the statement that Plaintiff seemed to remember but could not access those memories

when initiating behavior (Tr. 536). In social areas, Plaintiff could maintain personal appearance,

but he had fair abilities in behaving in an emotionally stable manner or demonstrating reliability, and

his ability to relate predictably in social situations was poor (Tr. 536). Dr. Robbins noted Plaintiff

was reliably passive in a manner consistent with frontal lobe impairments (Tr. 536). Dr. Robbins

further noted that Plaintiff had no ability to initiate meaningful work related behavior and could not

pay bills or maintain a schedule without prompting by others; she opined his symptoms would last

for at least 12 months and had started in January 2009 per her records (Tr. 537).

## III.     ALJ'S FINDINGS

### A.     Eligibility for Disability Benefits

The Social Security Administration determines eligibility for disability benefits by following

a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v). The five-step process provides:

> 1) If the claimant is doing substantial gainful activity, the claimant is
> not disabled.
>
> 2) If the claimant does not have a severe medically determinable
> physical or mental impairment-i.e., an impairment that significantly
> limits his or her physical or mental ability to do basic work
> activities-the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one
> of the listings in Appendix 1 to Subpart P of the regulations and
> meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from
> doing his or her past relevant work, the claimant is not disabled.

> 5) If the claimant can make an adjustment to other work, the claimant
> is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden to

show the extent of his impairments, but at step five, the Commissioner bears the burden to show that,

notwithstanding those impairments, there are jobs the claimant is capable of performing. *See*

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### B.    ALJ's Application of the Sequential Evaluation Process

At step one of this process, the ALJ found Plaintiff had not engaged in any substantial

gainful activity since March 1, 2008, the alleged onset date (Tr. 11). At step two, the ALJ found

Plaintiff had the severe impairment of major depressive disorder (Tr. 11). The ALJ determined this

impairment was severe because it caused significant vocational restrictions (Tr. 11). The ALJ noted

he did not find Plaintiff's kidney or thyroid problems to be severe because they had responded to

appropriate treatment and did not appear to involve ongoing complications (Tr. 11-12). At step

three, the ALJ found Plaintiff did not have any impairment or combination of impairments to meet

or medically equal any of the presumptively disabling impairments listed at 20 C.F.R. Pt. 404,

Subpt. P, App'x. 1 (Tr. 12). The ALJ specifically noted he considered Listings 12.04, 12.06 and

12.09 (Tr. 12). The ALJ determined Plaintiff had the residual functional capacity ("RFC") to

perform simple, repetitive work at all exertional levels that involved working with things rather than

with people (Tr. 13-14). At step four, the ALJ found Plaintiff was unable to perform any of his past

relevant work (Tr. 21). At step five, the ALJ noted Plaintiff was 37, a younger individual, as of the

alleged onset date (Tr. 21). After considering Plaintiff's age, education, work experience, and RFC,

the ALJ found there were jobs that existed in significant numbers in the national economy which

Plaintiff could perform (Tr. 21). This finding led to the ALJ's determination that Plaintiff was not under a disability since March 1, 2008 (Tr. 22).

## IV.   ANALYSIS

Plaintiff essentially asserts two arguments. First, Plaintiff argues, in multiple parts, that the ALJ erred in rejecting the opinion of treating physician Dr. Robbins in favor of Dr. Roth's opinion and that of the consulting agency physician. Second, Plaintiff asserts a general argument that the ALJ failed to fashion an adequate RFC with attention to Plaintiff's physical and mental impairments, which resulted in a flawed hypothetical question to the VE and a correspondingly flawed determination that there are jobs in the economy which Plaintiff could perform.

### A.   Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial

evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may not, however, consider any evidence which was not before the ALJ for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore, the court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-CV-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, No. 1:08-CV-651, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived).

### B.    Dr. Robbins' Opinion

Plaintiff argues the ALJ should have given substantial weight to the opinion of Dr. Robbins, which indicated Plaintiff had severe and disabling limitations, pursuant to the treating physician rule [Doc. 10 at PageID# 40-41]. Plaintiff asserts the factors to consider weigh in favor Dr. Robbins' opinion because she has treated Plaintiff since 2009 and is a specialist in his area of impairments [*id.* at PageID# 41]. Instead, the ALJ gave great weight to the opinion of Dr. Roth, who did not make any opinion as to Plaintiff's ability to work and specifically stated his examination was invalid as it pertained to activities of daily living [*id.* at PageID# 42]. Plaintiff argues Dr. Robbins' opinion

17

does not conflict with the findings of Dr. Roth and the ALJ improperly concluded Dr. Roth opined Plaintiff had no more than moderate limitations when Dr. Roth made no such finding [*id.*]. Plaintiff further asserts Dr. Robbins' opinion is consistent with the other evidence in the record, including the evaluation by Ms. Jones, and is supported by accepted diagnostic techniques [*id.*]. Plaintiff contends the ALJ was required to give the opinion controlling weight because it was well supported by and consistent with other evidence, and erred by giving it less than controlling weight [*id.* at PageID# 43].

The Commissioner argues the ALJ's RFC determination is consistent with much of Dr. Robbins' opinion, Dr. Roth's opinion, and Ms. Jones' opinion, as all opinions indicated Plaintiff would likely be able to deal with simple work instructions but would have more difficulties with complex instructions [Doc. 12 at PageID# 55-56]. The Commissioner contends the restriction that Plaintiff work with things instead of people is consistent with Dr. Robbins' opinion that Plaintiff had poor abilities to interact with the public, relate predictably in social situations, or relate to coworkers, and that this limitation is more restrictive than the moderate limitations in these areas opined by Ms. Jones and Dr. Gann [*id.* at PageID# 56]. The Commissioner acknowledges the ALJ rejected portions of Dr. Robbins' opinion, particularly the opinions that Plaintiff could not deal with stress, would not be able to maintain persistence and pace for specific tasks, and could not maintain a schedule; the Commissioner asserts, however, that the ALJ found Plaintiff not credible on these issues and found these parts of Dr. Robbins' opinion unsupportable because she failed to recognize Plaintiff's malingering and drug seeking behavior [*id.* at PageID# 57]. Instead, the ALJ afforded great weight to the opinion of Dr. Roth, which involved statements about Plaintiff's malingering and exaggerating of symptoms, and this provided sufficient basis to discount portions of Dr. Robbins'

opinion that relied upon Plaintiff's subjective complaints [*id.* at PageID# 57-58]. The ALJ noted inconsistencies with respect to Plaintiff's reports about continued drug abuse, but Dr. Robbins accepted Plaintiff's statements that he was not abusing drugs [*id.* at PageID# 58]. The Commissioner argues Dr. Robbins' opinion was not entitled to great weight because she failed to indicate Plaintiff's alcohol and drug abuse in her opinion and she listed frontal lobe impairments as Plaintiff's problem, but Dr. Roth opined Plaintiff did not have deficits due to head trauma or other medical illness [*id.* at PageID# 58-59]. Finally, the Commissioner argues Dr. Robbins only saw Plaintiff about once every three months, indicating Plaintiff's condition was not that severe, and that he was never hospitalized for psychiatric reasons [*id.* at PageID# 59]. The Commissioner argues the ALJ properly gave great weight to the opinions of Dr. Roth and Ms. Jones, who both essentially opined Plaintiff had moderate limitations; these findings, along with the opinion of Dr. Gann, supported the ALJ's RFC determination but were inconsistent with Dr. Robbins' opinion [*id.* at PageID# 60-61].

The law governing the weight to be given to a treating physician's opinion, often referred to as the treating physician rule, is settled: A treating physician's opinion is entitled to complete deference if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original). Even if the ALJ determines that the treating source's opinion is not entitled to controlling weight, the opinion is still entitled to substantial deference or weight commensurate with "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with

the record as a whole, and the specialization of the treating source." 20 C.F.R. § 404.1527(d)(2); SSR 96-2p; *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 192 (6th Cir. 2009). The ALJ is not required to explain how he considered each of these factors, but must nonetheless give "good reasons" for rejecting or discounting a treating physician's opinion. *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson*, 378 F.3d at 545 (quoting SSR 96-2p). Failure to give good reasons requires remand, even if the ALJ's decision is otherwise supported by substantial evidence, unless the error is de minimis. *Id.* at 544, 547.

The United States Court of Appeals for the Sixth Circuit recently reiterated that remand may be required when the ALJ fails to specify the weight afforded to a treating physician's opinion and fails to provide good reasons for giving the opinion an unspecified weight that is less than controlling. *Cole v. Astrue*, 661 F.3d 931, 938-39 (6th Cir. 2011). The *Cole* court stated "[t]his Court has made clear that '[w]e do not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned." *Id.* at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)). In *Cole*, the Sixth Circuit again recognized that a violation of the "good reasons" rule could only be harmless error under three circumstances: where the treating source opinion was patently deficient such that it could not be credited; where the Commissioner adopted the opinion of the treating source or made findings consistent with that opinion; or where the Commissioner otherwise

met the goal of the treating source regulation, 20 C.F.R. § 404.1527(d)(2). *Id.* at 940 (quoting *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010)). While each case must be evaluated to determine if the required procedures have been appropriately followed, an ALJ's failure to specify the weight afforded to a treating physician could, on its own, provide sufficient grounds for remand. *Cole*, 661 F.3d at 939-40.

The ALJ stated as follows with respect to Dr. Robbins' opinion:

> The undersigned rejects the opinion of Dr. Robbins. Although Dr. Robbins opined that the claimant had serious to no ability to function in several areas of mental functioning, such opinion is inconsistent with the overall medical evidence of record and cannot be afforded great weight as the claimant has history of malingering.

(Tr. 20). The ALJ noted he gave significant weight to the findings of Dr. Roth, particularly his opinion that Plaintiff had no more than moderate limitations in social and occupational functioning, stating this evidence was consistent with the RFC and the other evidence in the record (Tr. 19-20). The ALJ noted he gave great weight to Ms. Jones' assessment, although he rejected her GAF score as indicating more severe symptoms that were not consistent with her own findings or other evidence (Tr. 20). Finally, the ALJ noted he gave some weight to the state agency consultant's conclusions that Plaintiff had mild or moderate difficulties, but he rejected Dr. Gann's opinion that Plaintiff had had one or two episodes of decompensation, as this was not reflected in the evidence (Tr. 20).

Although the Commissioner argues the ALJ adopted some of Dr. Robbins' restrictions in his RFC determination, it appears from the language of the decision that the ALJ rejected Dr. Robbins' opinion. I **CONCLUDE** that, by use of this language, the ALJ gave the opinion very little or no weight and did not specifically incorporate Dr. Robbins' limitations in his RFC. Because he

21

undisputedly did not give Dr. Robbins' opinion controlling weight, the ALJ was required to give good reasons for the weight, or lack thereof, given to Dr. Robbins' opinion.  I **FIND**, however, that the ALJ did not provide sufficient good reasons for what appears to be his complete rejection of Dr. Robbins' opinion.  Although the Commissioner outlined various possible good reasons for limiting the weight given to Dr. Robbins' opinion in the brief before this Court, the bulk of those reasons do not appear in the ALJ's decision; instead, the ALJ simply stated he found the opinion to be inconsistent with the record and that Plaintiff had a history of malingering.  These statements, without further explanation, are not adequate under the circumstances.

I **FIND** the statements particularly troubling because the only "history" of malingering present in the record is in the opinion of Dr. Roth, which was given significant weight by the ALJ. Dr. Roth emphasized, however, that the results of his testing were largely invalid or uninterpretable due to the apparent malingering, exaggeration of symptoms, and poor effort.  As Plaintiff correctly pointed out, the ALJ referenced an opinion Dr. Roth made as to Plaintiff's moderate limitations in social and occupational functioning, but Dr. Roth made no such opinion.  In fact, Dr. Roth specifically stated he could not form an opinion as to Plaintiff's ability with respect to activities of daily living because his results were invalid, and stated as such about other test results throughout his written evaluation; Dr. Roth also consistently noted the results should be interpreted with great caution (Tr. 518-20).  Dr. Roth's evaluation does not contain any opinion as to Plaintiff's work-related or social abilities beyond Dr. Roth's speculation that Plaintiff's exaggeration of symptoms might be to avoid work and/or social relationships (Tr. 520).  Nonetheless, the ALJ relied upon this opinion, which essentially was invalid as per Dr. Roth and asserted no opinions as to Plaintiff's abilities, to the exclusion of Dr. Robbins' opinion.

22

As noted above, a violation of the "good reasons" rule can only be harmless error under three circumstances: where the treating source opinion was patently deficient such that it could not be credited; where the Commissioner adopted the opinion of the treating source or made findings consistent with that opinion; or where the Commissioner otherwise met the goal of the treating source regulation, 20 C.F.R. § 404.1527(d)(2). *Cole*, 661 F.3d at 940. None of these circumstances apply in this case. The entirety of Dr. Robbins' opinion was not patently deficient, even in the face of evidence that Plaintiff has a history of drug and alcohol abuse and evidence that Plaintiff was malingering during Dr. Roth's evaluation. Although the Commissioner argues the ALJ adopted some of Dr. Robbins' restrictions, he did not make findings consistent enough with Dr. Robbins' opinion to outweigh his explicit rejection of the opinion. Finally, the ALJ did not meet the goal of the regulation because it is not apparent from his decision why he rejected Dr. Robbins' opinion as being inconsistent with the overall medical evidence of record or what weight, if any, he gave the opinion. Here, the ALJ rejected the treating physician opinion, strongly favored an invalid neuropsychological evaluation that contained little to no opinions as to Plaintiff's abilities, and chose parts of the other two mental health assessments in the record to reach his RFC determination.

It is clear from the hearing transcript and the decision that the ALJ was disturbed by Plaintiff's history of drug and alcohol abuse and the report of Dr. Roth. The ALJ's consideration of Plaintiff's drug and alcohol abuse and his heavy emphasis on Dr. Roth's impression of malingering, however, does not excuse him from following other applicable regulations in his consideration of all the evidence in the record and, specifically, his necessary compliance with the treating physician rule. As such, I **FIND** the ALJ did not comply with the treating physician rule and I **CONCLUDE** this failure was not harmless error.

Accordingly, I **CONCLUDE** Plaintiff's claim must be remanded to the Commissioner for

compliance with the treating physician rule and full consideration of Dr. Robbins' opinion in conjunction with the other evidence in the record.[3]  Plaintiff is forewarned that this report and recommendation expresses no opinion, and has no bearing, on the ultimate decision that may result after remand and the proper application of the treating physician rule.

## V.    CONCLUSION

Having carefully reviewed the administrative record and the parties' arguments, I **RECOMMEND** that:[4]

> (1)    Plaintiff's motion for judgment on the pleadings [Doc. 9] be **GRANTED IN PART** and **DENIED IN PART**.

> (2)    The Commissioner's motion for summary judgment [Doc. 11] be **DENIED**.

> (3)    The Commissioner's decision denying benefits be **REVERSED** and **REMANDED** pursuant to Sentence Four of 42 U.S.C. § 405(g) for action consistent with this Report and Recommendation.

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[3]  Plaintiff has also raised a general argument as to the ALJ's RFC determination.  Because the ALJ's RFC may be impacted by a proper consideration of Dr. Robbins' opinion, I do not address this argument here.

[4]  Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure.  Failure to file objections within the time specified waives the right to appeal the district court's order.  *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).